UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TERESA LAW, | CASE NO. 1:22-CV-00900-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

INTRODUCTION

Plaintiff Teresa Law filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On May 31, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated May 31, 2022). Subsequently, all parties consented to my exercising jurisdiction over this matter pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure (ECF #6); accordingly, on June 6, 2022, this matter was reassigned to me for disposition (non-document entry dated June 6, 2022). Following review, and for the reasons stated below, I **AFFIRM** the Commissioner's decision denying DIB.

PROCEDURAL BACKGROUND

Ms. Law filed for DIB on February 27, 2020, alleging a disability onset date of March 1, 2019. (Tr. 148-149). Her claims were denied initially and on reconsideration. (Tr. 60-67, 68-75). She then requested a hearing before an Administrative Law Judge. (Tr. 92-93). Ms. Law (represented by counsel) and a vocational expert (VE) testified before the ALJ on May 20, 2021. (Tr. 34-59). On June 3, 2021, the ALJ issued a written decision finding Ms. Law not disabled. (Tr. 12-33). The Appeals Council denied Ms. Law's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 416.1455, 416.1481). Ms. Law timely filed this action on May 31, 2022. (ECF #1).

FACTUAL BACKGROUND

I.      Personal and Vocational Evidence

Ms. Law was 48 years old on her alleged onset date, and 50 years old at the administrative hearing. (Tr. 60, 148-49). She completed high school (Tr. 172) and previously worked as a leasing agent (Tr. 52-53) and an estimator (Tr. 181-82).

II.     Relevant Medical Evidence

On October 17 and November 11, 2019, and January 14, 2020, Ms. Law was seen at the North Ohio Heart Medical Group for physical complaints, but documented problems included attention deficit disorder (ADD), anxiety disorder, fatigue, and obsessive-compulsive disorder (OCD). (Tr. 294, 307, 326).

Aasia Syed, M.D., of the Southwest General Medical Behavioral Group performed a psychiatric evaluation on November 26, 2019. (Tr. 347). Dr. Syed noted a psychiatric history that included outpatient treatment and counseling, a depressed mood, fragmented sleep, moderately

impaired focus and concentration, decreased appetite, anxiety, racing thoughts, panic attacks, suppressed anger, social phobia, and obsessive-compulsive acts. (Tr. 347-49). Ms. Law reported difficulty remembering how to perform simple tasks but noted some improvement with Adderall. (Tr. 347). She also reported moderate impairment of focus and concentration, moderate to severe anxiety, and feeling overwhelmed with the remodeling and construction that was being performed at her house. (*Id.*). Ms. Law told Dr. Syed she had two to three panic attacks in the previous month, has difficulty in crowded places, and suffers from obsessive checking and maintains particular ways she needed to perform certain activities. (Tr. 347-48).

Dr. Syed found Ms. Law exhibited good hygiene and eye contact, was hyper-talkative, but cooperative and polite. (Tr. 350-51). Her attention, concentration, judgment and insight were fair, and her memory was intact. (Tr. 351). Dr. Syed diagnosed generalized anxiety disorder, ADD, panic disorder, and OCD. (*Id.*).  She prescribed Lamotrigine and advised Ms. Law to continue taking Adderall. (*Id.*).

When Ms. Law returned to see Dr. Syed on December 5, 2019, she exhibited increased stress, depression, and OCD. (Tr. 353). She told Dr. Syed that she stopped taking Adderall due to side effects that affected her depressive symptoms. (*Id.*). On examination, her affect was congruent, anxious, and depressed. (Tr. 355). She described increased symptoms of anxiety and OCD, and exhibited psychomotor retardation upon examination. (Tr. 353, 355). She was prescribed Zoloft. (Tr. 355).

On January 23, 2020, Ms. Law returned for follow up with Dr. Syed and described significant life stressors exacerbating her anxiety and lack of focus. (Tr. 357). Zoloft had increased her ability to focus such that she purchased a machine for quilting. (*Id.*). She exhibited good

hygiene, maintained good eye contact, and was cooperative and polite. (Tr. 359). Her attention, concentration, judgment, and insight were fair, and her memory was intact. (Tr. 359). Dr. Syed provided education about generalized anxiety disorder and noted her interest in quilting came about despite not taking Adderall. (Tr. 360). Ms. Law's diagnoses expanded to include major depressive disorder, recurrent episode, generalized anxiety disorder, OCD, and panic disorder, with noted improvement. (Tr. 359, 361).

On February 13, 2020, Ms. Law reported she had been unable to fall asleep for two weeks, she was worried and anxious, experienced several panic attacks, and anxiety interfered with her concentration. (Tr. 362). She explained her focus had improved without medication but when her anxiety increased, she was unable to focus. (*Id.*). Her clinical findings remained unchanged, and Dr. Syed adjusted her medications to help with anxiety. (Tr. 364).

On March 12, 2020, treatment notes documented ongoing problems with ADD, anxiety, depression, generalized anxiety disorder, major depressive disorder, moderate recurrent major depression, OCD, and panic disorder with moderate panic attacks. (Tr. 366). She exhibited tearfulness, anxiety, and poor sleep due to her father's recent cancer diagnosis. (Tr. 366, 368). Otherwise, her examination findings were unchanged, and Dr. Syed adjusted her medication. (Tr. 367-68).

Ms. Law had a telehealth appointment with Dr. Syed on April 9, 2020 in which she described significant life stressors but reported the medication was helping. (Tr. 370). Despite being anxious and depressed, her process was goal directed; her attitude was cooperative; her memory, judgment, and insight were fair; and she remained attentive during the interview. (*Id.*).

Dr. Syed increased Ms. Law's Zoloft dosage, but otherwise her treatment regimen remained unchanged. (Tr. 372).

Ms. Law reported to Dr. Syed on June 4, 2020 that she had not left her house for fear of "something bad happening." (Tr. 374). She was depressed and anxious. (Tr. 375-76). On August 6, 2020, Ms. Law reported depression, anxiety, and one panic attack since her last appointment. (Tr. 380). On August 6 and September 24, 2020, she still exhibited diagnoses of generalized anxiety disorder, major depressive disorder, recurrent episode, OCD, and panic disorder with agoraphobia and moderate panic attacks. (Tr. 382, 386). Ms. Law's cardiologist examined her on September 8, 2020 and diagnosed her with agoraphobia with panic attacks, fatigue, and depression. (Tr. 390).

On January 21, 2021, Ms. Law was depressed, anxious, and not doing well. (Tr. 535). Dr. Syed wrote, "[p]atient has a hearing for disability coming up, and I would support that because of her severe anxiety, dysphoric and dysthymic mood, and inability to carry out function due to overwhelming negative thoughts." (Tr. 538).

On March 8, 2021, Ms. Law reported exhaustion when shopping, needing her sister when going anywhere, getting panic attacks in public places and when driving, and reliance on her sister and husband. (Tr. 540). Her mental status examination indicated her memory, attention, concentration, insight, and judgment were fair, and she had a linear and goal directed thought process. (Tr. 542).

III.    **Medical Opinions**

State agency medical consultants reviewed Ms. Law's record at the initial and reconsideration levels.

Irma Johnson, Psy.D., opined on June 26, 2020 that Ms. Law required little to no interaction with the general public, infrequent interaction with others, and static, routine tasks. (Tr. 65). Dr. Syed also completed a mental functional capacity report on October 15, 2020 in which she found that Ms. Law was markedly limited in completing tasks in a timely manner and in ignoring or avoiding distractions while working, and extremely limited in working close to or with others without interrupting or distracting, sustaining an ordinary routine and regular attendance, working a full day without needing more than the allotted number or length of rest periods, adapt to changes, and manage psychologically based symptoms. (Tr. 407-08). Dr. Syed premised her assessment on Ms. Law's generalized anxiety disorder, major depressive disorder, recurrent episode, obsessive compulsive disorder, panic disorder with agoraphobia and moderate panic attacks. (Tr. 408). Dr. Syed concluded that Ms. Law's severe anxiety impaired her adaptive skills in a work setting. (Id.).

Courtney Zeune, Psy.D., reviewed Ms. Law's medical records and agreed on December 15, 2020 that Ms. Law required little to no interaction with the general public, infrequent interaction with others, and static, routine tasks. (Tr. 73-74).

On February 2, 2021, Dr. Syed submitted a second mental functional capacity assessment (Tr. 508-09). She found Ms. Law was markedly limited in recognizing a mistake and correcting it, identifying and solving problems, sequencing multi-step activities, stating her own point of view, and in understanding and responding to social cues. (Tr. 508). She was also extremely limited in using reason and judgment; asking for help; handling conflicts with others; responding to requests, suggestions, criticism, correction, and challenges; keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness; in performing most tasks involving

6

concentration, persistence, and pace; responding to demands; adapting to changes; managing psychologically based symptoms; and in making plans independently. (Tr. 508-09). Dr. Syed explained Ms. Law "has severe panic attacks, is emotionally labile, unable to drive, depends on her sister, is very sensitive to illness and death of loved ones (several during last year), cries easily, catastrophizes situations, has fainted, and was under care for loss of consciousness. She remains in her safety zone." (Tr. 509) (cleaned up).

On January 4, 2021, Shari Mayer, LISW-S, Ms. Law's counselor, filled out a medical source statement based on treatment since March 16, 2020 for unspecified depressive disorder and unspecified anxiety disorder. (Tr. 505). Ms. Mayer also noted Ms. Law's diagnosis of ADHD. (*Id.*). Ms. Law advised Ms. Mayer of her significant insomnia, low motivation, fatigue, severe social anxiety, and panic attacks in crowded or unfamiliar settings. (*Id.*). Ms. Mayer concluded that these symptoms would make it difficult for Ms. Law to function in many places of employment. (*Id.*). The same day, Ms. Mayer completed a mental functional capacity report, referencing her letter, finding that Ms. Law was markedly to extremely limited in most functions involving understanding, remembering, and applying information, interacting with others, and in concentration, persistence, and pace (Tr. 506-07).

## IV.  Administrative Hearing

Ms. Law has not worked since her alleged onset date of March 1, 2019. (Tr. 41). She cannot work because she has a hard time concentrating and remembering things, and multitasking is impossible for her. (Tr. 23). She is exhausted from not being able to sleep well, so much so that if she sits down, she will fall asleep, and has fallen asleep during therapy sessions before. (*Id.*). She has severe panic attacks while driving, and requires her sister or husband take her to the store to

grocery shop. (Tr. 43-44). She does not like to be out in public by herself, and her sister is usually

with her. (Tr. 44). She has poor recollection of everyday thoughts. (*Id.*).

Ms. Law's panic attacks can be triggered by stressful situations but also occur randomly.

(*Id.*). Her panic attacks cause very rapid heart rate, shakiness, tremors, and tightness in her chest,

and she feels extremely hot. (*Id.*). She has anywhere from one to three a day. (*Id.*). She can

sometimes make it through a day without having a panic attack, but rarely. (*Id.*). On average, she

experiences a panic attack about six out of every seven days. (Tr. 45). In addition to seeing a

therapist weekly, she treats with psychiatrist Dr. Syed and takes hydroxyzine for panic attacks,

which makes her very tired. (*Id.*). Her medication has improved her OCD and made her

depression manageable. (Tr. 46). However, the Covid-19 pandemic has made her agoraphobia

"1,000 times worse," and she does not like to leave her house. (*Id.*). She takes a variety of

medications before going to sleep, and if she takes them too late, the next day she is very groggy

and unable to think. (Tr. 46-47).

She also does not get along well with people, "going off on them" if they get on her nerves.

(*Id.*). As a result, she does not have friends, and often gets into fights with her sister. (*Id.*). She

experiences the same irritation in a work setting. (*Id.*). At a previous job, she called the vice

president of her company "obtuse" and "went off on" upper management for giving her work

outside of her job description. (Tr. 49). She also called a co-worker an expletive to her face. (*Id.*).

Ms. Law previously worked as a fire sprinkler inspector for ATCO Fire in 2016. (Tr. 50).

She left the job because she began having panic attacks about going to work because her superiors

kept piling on more duties. (*Id.*). Her doctor recommended a leave of absence for mental health,

and she never returned. (*Id.*). She then worked as a substitute teacher, sometimes four or five days

8

a week, other times one or two days. (*Id.*). She has not performed any full-time work other than those instances for the past 15 years. (Tr. 51).

VE Byrnes then testified. She categorized Ms. Law's past relevant work as leasing agent, DOT number 250.357-014, SVP of 5, skilled, light physical demand. (Tr. 52). As performed, she was sedentary 95% of the time and lifted 10-15 pounds occasionally. (Tr. 53-54).

Ms. Law's job at ATCO Fire was categorized as estimator, DOT number 169.267-038, SVP of 7, skilled, sedentary physical demand. (*Id.*). As performed, she split her time 50/50 sitting versus standing and walking, lifting no more than 20 pounds. (Tr. 52-53).

**Hypothetical One.** VE Byrnes then assumed a hypothetical individual of Ms. Law's age, education, and work history with no exertional limitations, but limited to performing jobs requiring little to no interaction with the general public and infrequent interaction with co-workers and supervisors, a static environment with routine tasks, and avoidance of pulmonary irritants such as fumes, odors, dust, gases, and poor ventilation. (Tr. 55-56). VE Byrnes testified that such an individual would not be able to perform Ms. Law's past relevant work, but could perform other jobs such as counter supply worker, DOT number 319.687-10; hand packer, DOT number 920.587-018; or store laborer, DOT number 922.687-058. (Tr. 56-57). All three are categorized as medium physical demand level, SVP of 2, unskilled. (Tr. 57).

VE Byrnes also testified that an employer will typically tolerate up to 15 percent of the workday off-task, equating to roughly 8 minutes an hour. (*Id.*).

## THE ALJ'S DECISION

The ALJ's decision of June 8, 2021 included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2. The claimant has not engaged in substantial gainful activity since March 1, 2019, the alleged onset date (20 CFR 404.1571 et seq.).

3. The claimant has the following severe impairments: panic disorder with agoraphobia; major depressive disorder, recurrent episodes; generalized anxiety disorder; obsessive-compulsive disorder; attention deficit disorder, and asthma (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: is limited to performing jobs that require little to no interaction with the general public, and infrequent interaction with coworkers and supervisors; requires a static environment with routine tasks; would need to avoid concentrated exposure to pulmonary irritants, such as fumes, odors, dusts, gasses, and poor ventilation.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on August 21, 1970 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

(Tr. 17-28).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

11

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1.      Was claimant engaged in a substantial gainful activity?

2.     Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.     Does the severe impairment meet one of the listed impairments?

4.     What is claimant's residual functional capacity and can claimant perform past relevant work?

5.     Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Ms. Law's sole argument is the ALJ erred in his assessment of the persuasiveness of the opinion evidence from Dr. Syed and Ms. Mayer by "selectively parsing the evidence of record." (Pl.'s Br., ECF #11, page 9).[1] In determining Ms. Law's RFC. the ALJ evaluated the medical opinions in the record, including those from Dr. Syed and Ms. Mayer.

---

[1]     Ordinarily, citations to the case record are based on the PageID of the document, which appears in the header stamped on every document filed with the Court. During preparation of this Memorandum Opinion and Order, the CM/ECF system has temporarily ceased displaying headers on some filed documents. When this opinion was drafted, the issue had not been

A claimant's RFC is the most the claimant can do despite the claimant's limitations. 20 C.F.R. § 416.945(a)(1). It is the ALJ's responsibility to assess a claimant's residual functional capacity, an assessment that must be made based on all the relevant evidence in the record. *Id.* at § 416.945(a)(1); *see also id.* at § 416.946(c). The claimant is responsible for providing evidence to prove disability and must inform the ALJ of additional related evidence of which the claimant later becomes aware. *Id.* at § 416.912(a)(1). The ALJ has a basic obligation to develop a full and fair record. *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983).

Because Ms. Law filed her application after March 27, 2017, the medical opinions are evaluated under the regulations found in 20 C.F.R. § 416.920c. Under these revised regulations, the ALJ is to articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* at § 416.920c(b). The regulations define a medical opinion as "a statement from a medical source about what [the claimant] can still do despite [his] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions" in the ability to perform physical demands of work activities, the ability to perform mental demands of work activities, the ability to perform other demands of work, and the ability to adapt to environmental conditions. 20 C.F.R. § 416.1513(a)(2).

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. 20 C.F.R. at § 416.920c(a); *see also Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). Instead, the ALJ must articulate the

---

resolved. Therefore, citations to the parties' briefs are to the PageID when displayed, but otherwise are to the page number of the document.

consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability[2] and consistency.[3] 20 C.F.R. § 416.920c(b). An ALJ must explain how he considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. § 416.920c(b)(2)-(3). That said, an ALJ's failure to specifically mention the words "supportability" and "consistency" does not necessarily mean the ALJ did not consider those factors. *Hardy v. Comm'r of Soc. Sec.*, No. 2:20-cv-4097, 2021 WL 4059310, at *2 (S.D. Ohio Sept. 7, 2021).

Agency regulations no longer require deference to a treating physician's opinion, but the reason-giving requirement still exists so claimants (and reviewing courts) may understand the disposition of their claims. *See Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 908 (E.D. Mich. 2021) (applying the reason-giving requirement "with equal force to the new regulations, which require explanations for determinations that a medical opinion is unpersuasive."). Agency regulations "set forth a 'minimum level of articulation' to be provided in determinations and decisions, in order to 'provide sufficient rationale for a reviewing adjudicator or court.'" *Warren I. v. Comm'r of Soc. Sec.*, No. 20-495, 2021 WL 860506, at *8 (N.D.N.Y. Mar. 8, 2021) (quoting 82 Fed. Reg. 5844-01 (2017)).

---

[2]     "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. § 416.920c(c)(1).

[3]     "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

Ms. Law argues the ALJ erred in relying on nonexamining medical opinions premised on an incomplete record. (ECF #12, page 9). She argues the consulting opinions the ALJ favored were issued prior to the submission of substantial evidence into the record, including a report and mental functional assessment from Ms. Mayer, continuing treatment records, and an updated mental functional capacity assessment from Dr. Syed. (*Id.* at 9-10) (citing Tr. 505-09, 531-40).

Ms. Mayer's mental functional assessment was submitted on January 4, 2021. (Tr. 505). Dr. Syed's medical source statement is dated February 2, 2021, and additional treatment records from Dr. Syed were likewise submitted May 13, 2021. (Tr. 509, 530). The ALJ relied on state agency psychological consultants Dr. Johnston and Dr. Zeune, who submitted assessments on June 26 and December 15, 2020, respectively. (Tr. 67, 72). The ALJ also relied on Dr. DiLisi's functional assessment completed on February 9, 2021. (Tr. 25).

As a practical matter, discounting opinions because evidence is added after that review would preclude multiple doctors from reviewing a claimant's records; by nature of the fact that multiple professionals will review the patient's medical history, later reviewers will always have the benefit of a more information than early reviewers. The question becomes whether the omitted records constitute a "critical body of objective medical evidence" under *Kizys v. Comm'r of Soc. Sec.*, No. 10-CV-25, 2011 WL 5024866, at *2 (N.D. Ohio, Oct. 21, 2011), and *Deskin v. Comm'r of Soc. Sec.* 605 F.Supp.2d 908, 913 (N.D. Ohio, 2008). "*Deskin* sets out a narrow rule that does not constitute a bright-line test. It potentially applies only when an ALJ makes a finding of work-related limitations based on no medical source opinion or an outdated source opinion that does not include consideration of a critical body of objective medical evidence." *Kizys*, 2011 WL 5024866 at *2 (citing *Deskin*, 605 F.Supp.2d 908).

16

Whether the omitted records constitute a "critical body of objective medical evidence" depends on multiple factors, including the length of period of treatment omitted, whether the omitted records contain novel or different symptoms or diagnoses than non-omitted records, and whether the omission of those records would likely change the RFC. The Court must "determine whether it was the type of medical evidence that required a medical opinion" to enable the ALJ to make the disability decision. *Stevenson v. Kijakazi*, No. 20-CV-2688, 2022 WL 4551590, at *15 (N.D. Ohio Sept. 29, 2022) (quoting *Gonzales v. Comm'r of Soc. Sec.*, No 21-cv-00093, 2022 WL 824145, at *10 (Mar. 18, 2022)). For example, in *Berrier v. Comm'r of Soc. Sec.*, the court declined to apply the *Deskin* rule:

> [i]n particular, Claimant has not demonstrated that the RFC is flawed because of a 'critical body of objective medical evidence' post-dating the medical source opinions considered by the ALJ. Additionally, unlike the two years of medical treatment in *Deskin*, only five months of medical evidence followed the final state agency review of Claimant's medical records. Other courts have declined to remand for updated medical opinions under similar circumstances.

*Berrier v. Comm'r of Soc. Sec.*, No. 20-cv-01655-JZ, 2021 WL 6881246, at *7 (N.D. Ohio, Sept. 10, 2021). In *Earick v. Comm'r of Soc. Sec.*, medical records constituted a critical body of objective medical evidence because they included significant findings, including "numerous examinations with abnormal findings, MRIs, multiple steroid injections, and two surgical procedures." *Earick v. Comm'r of Soc. Sec.*, No. 20-cv-234, 2021 WL 4552396, at *3, (S.D. Ohio, Oct. 5, 2021).

I do not find that Drs. Johnston, Zeune, or DiLisi reviewed a record missing a critical body of objective medical evidence. They were able to review all treatment records with multiple physicians, including Dr. Syed, leading up to late 2020. It is true they did not have the benefit of Ms. Mayer's functional assessment or records reflecting three visits with Dr. Syed, including an updated functional report she submitted. However, Ms. Mayer's functional assessment was not

17

submitted alongside any treatment records and, as explained more fully below, was completed with significant reliance on Ms. Law's own self-reporting, one of the reasons the ALJ found it to be less persuasive. Although the later-submitted treatment records from Dr. Syed involved more objective treatment, those records reflected only three telehealth appointments that did not demonstrate any significant change in Ms. Law's status, but rather reflected symptoms already reported. (Tr. 530-43). This is a far cry from the two years of records omitted in *Deskin* or even the five months of records omitted in *Berrier*. And, unlike *Earick*, the omitted records contained no in-person examinations, tests, or procedures. It is not the type of medical evidence that requires a fresh medical opinion to enable the ALJ to make the disability decision.

Ms. Law also argues the ALJ performed a perfunctory evaluation of the opinions, finding it contrary to selective treatment notes reporting Ms. Law was polite and cooperative, could maintain good hygiene, pay attention, demonstrated a good memory, and had some improvement with treatment. (*Id.* at 10) (citing Tr. 26-27). This type of "cherry picking," Ms. Law argues, is not permitted by the Sixth Circuit when determining the RFC. (*Id.*) (citing *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014), and *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 425 (6th Cir. 2013)). For example, she states, the ALJ did not weigh actual in-office treatment versus consultant paper review in his supportability analysis. (*Id.*).

The Sixth Circuit has found a claimant's allegation that the ALJ cherry-picked evidence "'is seldom successful because crediting it would require a court to re-weigh record evidence.'" *Byler v. Kijakazi*, No. 20-cv-1822, 2022 WL 980099, at *8 (N.D. Ohio, Jan. 21, 2022) (quoting *DeLong v. Comm's of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014)), *report and recommendation adopted*, 2022 WL 971384 (Mar. 31, 2022). The Commissioner notes the ALJ not only considered the supportability

18

and consistency of the opinions of Dr. Syed and Ms. Mayer, but also explained why the opinions were not persuasive and articulated the basis of that finding. (Comm'r's Br., ECF #14, page 12).

For example, the ALJ noted their assessments were not consistent with objective medical evidence or Ms. Law's reports that her symptoms improved with mental health treatment. (*Id.*). Similarly, the opinions showed a worsening of Ms. Law's condition that was not consistent with the ALJ's assessment of her mental functioning, which remained stable over time. (*Id.*).

The ALJ analyzed Dr. Syed and Ms. Mayer's functional reports as follows:

> Further, based on the claimant's reports, she was able to manage money, watch television, help care for her pets, sew, go to the flea market, garden, and spend time with family and friends (4E, 4F/7-10, 11F/11-14). For these reasons, the assessments of Dr. Syed are not persuasive as the level of limitation alleged is not support[ed] by these findings, to include with his treatment notes. Notably, Dr. Syed's assessments of the claimant's mental status remained generally stable over time, which is not consistent with the worsening in her assessed functioning between his two assessments. Similarly, the assessment of Ms. Mayer is not persuasive as the level of limitation alleged is not supported by previously summarized findings. The record contains no treatment notes findings with which to compare. Further, she outlined that she completed the functional assessment in collaboration with the claimant, which supports that it relied heavily on the claimant's subjective reports as compared to objective findings.

(Tr. 27).  As a result of these observations, the ALJ still found some functional limitations, as follows:

> To account for her mood abnormalities and noted difficulties interacting with others she is limited to performing jobs that require little to no interaction with the general public, and infrequent interaction with coworkers and supervisors. Further, to avoid triggering her symptoms with stress, she should perform work in a static environment with routine tasks.

(Tr. 26).

Regarding Dr. Syed's opinion, the ALJ acknowledged evidence supporting Dr. Syed's conclusion Ms. Law had mood abnormalities, fair attention and concentration, and fair insight

and judgment. (Tr. 26). However, the ALJ explained that at Ms. Law's visits with Dr. Syed, she always demonstrated a linear and goal-directed thought process with logical associations, a polite and cooperative presentation, the ability to maintain good eye contact, and good hygiene. (*Id.*). The ALJ noted Ms. Law's response to treatment, including self-reports of experiencing improvement in mental health symptoms with treatment and performed activities, such as managing money, watching television, helping care for her pets, sewing, going to the flea market, gardening, and spending time with family and friends. (Tr. 26-27). Based on this evidence, the ALJ found inconsistencies with Dr. Syed's opinion, in that Ms. Law's mental status remained generally stable over time but Dr. Syed's opinion noted a worsening from October 2020 to February 2021. (*Id.*).

The ALJ's analysis of Ms. Mayer's opinion is similarly thorough. According to Ms. Mayer, she had been providing mental health therapy services to Ms. Law since March 16, 2020. (Tr. 504). Ms. Mayer's corresponding letter prefaces Ms. Law's limitations with phrases "per Teresa," and "Teresa reports." (Tr. 505). She states, "I completed the enclosed Residual Functional Capacity form with Teresa's assistance, due to my lack of knowledge of her functioning while she was employed in the past." (*Id.*). Paired with the noticeable lack of any records reflecting the treating relationship between Ms. Law and Ms. Mayer, substantial evidence supported the ALJ's finding that Ms. Mayer's medical source statement was inconsistent with and unsupported by the remainder of the record.

Ms. Law argues this finding was based on a fundamental misunderstanding of the law— that medical providers are permitted to rely on a claimant's subjective reports and interviews are clearly an acceptable diagnostic technique in the area of mental impairments. (Pl.'s Br., ECF #12,

page 12) (citing *Warford v. Astrue*, No. CIV. A 09-52-GWU, 2010 WL 3190756, at *6 (E.D. Ky. Aug. 11, 2010)). But the ALJ did not discount Ms. Mayer's opinion solely because it was based on Ms. Law's subjective reports. Instead, the ALJ noted Ms. Mayer's opinion was inconsistent with objective medical evidence, Ms. Law's reported improvement with treatment, and her daily activities. (Tr. 26-27). The ALJ thus addressed the supportability of the opinion (few records supported Ms. Mayer's observations of such limitations) and the consistency (the medical source form was inconsistent with Ms. Law's condition as documented in the remainder of the record by herself as well as other providers).

With respect to both opinions, the ALJ's explanation meets the "minimum level of articulation" in order to provide sufficient rationale for a reviewing court. *Warren I.*, 2021 WL 860506, at *8. Although other evidence may support more restrictive limitations in Ms. Law's RFC, a finding that the ALJ "cherry-picked" portions of the record supporting a finding of non-disability requires that I re-weigh the evidence, which as noted above is not permissible. Because substantial evidence supports the ALJ's decision to find the opinions of Ms. Mayer and Dr. Syed generally inconsistent with and unsupported by the record, I cannot disturb the ALJ's decision. Ms. Law's sole assignment of error is not well-taken.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I **AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: April 5, 2023

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

21